JOHN D. KEILEY, JR., *vs.* JOSEPH J. TURNER, JR., AND THE SAFE DEPOSIT AND TRUST CO., EXECUTOR OF ·JOSHUA J. TURNER, SR.

*Partnership Accounts—Secret Agreement Between Two of Three Partners as to Salary—Appropriation of Partnership Property by One Partner Upon Dissolution—Interest.*

Upon the formation of a partnership between A, B and C, it was agreed between A and B (who contributed the capital) that A ·should receive a salary of $450 per month, but upon the books of the firm A and C were each credited with $300 per month and B with $150 per month ; and A received for some time the amount credited to B. The other partner, C, was ignorant of this agreement between A and B. Upon a bill for an account, filed by A after the dissolution of the firm, *Held*, that, as against the firm assets, A was entitled only to the sum of $300 per month, while as to the additional sum of $150 per month, his recourse was only against B.

In the above case the partnership was dissolved in December, 1882, but there were no entries of salaries on the books of the firm after August 1, 1881, at which time the bookkeeper was directed to discontinue the same as to all the partners. There was then an' agreement between A and B, unknown to C, that A's salary was to continue as previously. *Held*, that in this case A was not entitled to claim any salary after August 1, 1881.

It was stipulated in the articles that salaries should be paid out of the funds of the partnership, and should not be considered as losses. A allowed a portion of his said salary as partner to remain in the firm and be used for its benefit. *Held*, that he was entitled to interest on each month's salary as it became due, in the same manner that interest was allowed semi-annually to B on his contribution to the capital of the firm.

Upon the dissolution of a firm composed of A, B and C, the stock of merchandise on hand was taken possession of by B, who charged himself with it at a valuation fixed by himself and C. Some of the merchandise was shipped by B to New Orleans, and a loss was sustained on the shipment, owing to the failure of the purchasers to pay for it. Upon a bill by A for an account of the partnership affairs, *Held*,

1st. That A was entitled to his share of the true value of the property at the time it was appropriated by B, such appropriation having been

made with his consent, and that he had no concern with the subsequent appreciation or depreciation in the value of the property.

2nd. That the merchandise shipped to New Orleans, having been insured at a certain rate, and it being shown that it was customary in insuring such cargoes to add ten per cent. to the invoice cost, it could be assumed in this case that the value of the cargo was the amount insured, less ten per cent., and this amount should be charged to B as a fair price for the property at the time he took it into his possession.

Appeal from a decree of the Circuit Court of Baltimore City (DENNIS, J.) The bill in this case was filed on February 28, 1885, by the appellant, John D. Keiley, Jr., against Joshuà J. Turner and Joseph J. Turner, Jr. Its object was to procure a decree for an account of the affairs of the dissolved firm of J. J. Turner and Company, composed of the appellant and J. J. Turner, Sr. and J. J. Turner, Jr. Subsequently J. J. Turner, Sr., died, and the Safe Deposit and Trust Co. of Baltimore, his executor, was made a party defendant.

The testimony showed that the co-partnership was formed on March 19, 1878, and was to last for three years. Upon the expiration of the term of three years, it was renewed upon a verbal arrangement upon the same terms, and it was formally dissolved upon December 31, 1882.

The stipulation in the articles of partnership, as to salaries, is stated in the opinion of the Court. The salaries entered on the books to the several members of the firm were as follows: J. J. Turner, Sr., one hundred and fifty dollars per month; Mr. Keiley, three hundred dollars a month; and Joseph J. Turner, Jr., three hundred dollars a month. Mr. Keiley claims, however, that in reality, J. J. Turner, Sr., was to receive no salary, but that the one hundred and fifty dollars per month with which he was to be credited on the books were, by virtue of a private arrangement between him and J. J. Turner, Sr., to be paid to him. Joseph J. Turner, Jr., under this arrangement, was not to be informed of the inequality between himself and his brother-in-law, Mr. Keiley, in order to prevent jealousy on the part of J. J.

Turner, Jr., whom, Mr. Keiley says, J. J. Turner, Sr., mistrusted, and for fear that if such inequality had been made known to him, he would not have become a partner in the firm.

On December 31, 1878, Mr. Keiley ordered the bookkeeper to enter salaries to the credit of the several members of the firm, at the rate, from the beginning to that date, of one hundred and fifty dollars a month to J. J. Turner, Sr.; three hundred a month to Mr. Keiley, and three hundred a month to J. J. Turner, Jr., and so they were regularly entered thereafter down to August 1st, 1881, on the books of the firm.

When a discussion about the dissolution of the firm, as of the first of August, 1881, began, all the salaries to all the partners were stopped, and from that time down to the dissolution of the firm on December 31, 1882, no salaries were credited on the books to any of the partners. The order to discontinue them was given by Mr. Keiley, to the bookkeeper, and J. J. Turner, Jr., assented to the stopping of the salaries. The plaintiff offered evidence to show that this discontinuance was done under a private agreement between himself and Turner, Sr., in order to prevent overdrawing by Turner, Jr., but that in reality the plaintiff, Keiley, was to be entitled to his original $450 per month.

When the case was first argued below, the counsel for the appellees contended that the adjustment of the account on the books of the firm was correct, and that all Mr. Keiley was entitled to was the amount of $2,433.31, which had been tendered to him in October 1890. The ground of this contention by the appellees was that upon the dissolution of the firm on December 31, 1882, J. J. Turner, Sr., carried over to himself, as the settling partner, all the undisposed of merchandise belonging to the firm at certain prices, charging himself with these prices, which, it was insisted, was the full and fair market value of this undisposed-of merchandise. Charging himself with all this merchandise at these prices, a balance was shown to be due to Mr.

Keiley, which Mr. Turner was ready to pay, and which his executor tendered to Mr. Keiley in October, 1890. Mr. Keiley contended, however, that, inasmuch as he had not consented to this transfer of the undisposed-of merchandise of the firm to Mr. Turner at prices fixed by him, he, Mr. Keiley, was entitled to his share of the net proceeds of what was actually realized from such undisposed manufactured merchandise when sold by J. J. Turner, Sr., or the succeeding firm of J. J. Turner & Co. The Court below sustained the contention of Mr. Keiley in this particular.

There was conflicting evidence as to the amount of phosphate belonging to the firm taken over by Turner, Sr., as liquidating partner, and shipped to New Orleans, and as to the value of the same. The Court below found that the amount was 510 tons of phosphate. This was shipped by Turner to New Orleans, and the total loss on the shipment was $10,004.33, of which Keiley's share was $3,334.68.

The Court below held that the plaintiff was bound to stand his proportion of this loss ; that he was entitled to salary at the rate of $300 per month from March 19, 1878, to August 1, 1881, and passed a decree against the plaintiff for $900.22, with interest from January 1st, 1881.

The cause was argued before ROBINSON, C. J., BRYAN, McSHERRY, FOWLER, BRISCOE and BOYD, JJ.

*Charles Marshall* and *Edgar H. Gans* for the appellant.

The questions for this Court to determine, without going into the figures, are as follows : 1. What salary is to be allowed the appellant ? 2. What amount of merchandise was taken over by J. J. Turner, Sr.? 3. How is the value to be ascertained ? The answer of the Court to these questions will enable any Auditor to state an account showing the amount due the appellant.

I. *Salary.* The question of salary has four points of controversy : 1. How long is it to run ? 2. What is the amount per month ? 3. Can any part of salary be charged

against appellant as a loss of the business ?    4. Is interest to be allowed on it ?    These questions are mainly to be answered by a proper construction of the articles of co-partnership.    That these articles constitute the true agreement of the parties is shown by the answers of the respective defendants.    It is true that the plaintiff states in his bill that three copies of the articles were signed, and that the copies retained by him and Joshua J. Turner, Sr., contained an allowance of $450 per month salary to the appellant, and $300 per month to Joseph J. Turner, Jr., whilst the copy given to Joseph J. Turner, Jr., contained a salary of $300 per month to the appellant, $300 a month to Joseph J. Turner, Jr., and $150 per month to Joshua J. Turner, Sr., which were, in fact, the amounts entered up in the books.    The object of doing this is also explained in the bill to be a method of preventing the family jealousy that might arise, if J. J. Turner, Jr., thought that the appellant was getting more salary than he was.    The $150 per month, however, credited on the books to Joshua J. Turner, Sr., was only formal as to him, and in reality belonged to the appellant. Now, it is apparent that, though these allegations in the bill furnish an explanation of the reason for nominally crediting Joshua J. Turner, Sr., with $150 per month salary, the real agreement was that the appellant was to receive $450 per month, Joseph J. Turner, Jr., $300 per month, and Joshua J. Turner, Sr., nothing, as salary.    This is the real agreement alleged in the bill as to the *right* to the salaries, and is admitted in the answers of both defendants.

Again, when these salaries become due each month, the parties of the second and third part would have a perfect right to draw out the money and invest it in any interest-bearing security.    As a matter of fact, it appears that the appellant allowed his salary simply to be credited from month to month, just as Joshua J. Turner, Sr., allowed his interest to be credited semi-annually.    And, therefore, just as the accounts show that Joshua J. Turner, Sr., was allowed interest on these semi-annual credits, so also should the

appellant be allowed interest on his monthly credits of salary and on any other capital which he paid into or allowed, in the shape of yearly profits, to remain in the concern. For those become contributions by him to the capital stock.

But it is urged that this understanding between Turner, Sr., and the appellant, that salaries were not to be credited after May 1, 1881, was a fraud on Joseph J. Turner, Jr., as he was led to believe that the salaries had ceased, and acted accordingly. We answer: 1st. That it is irrational to charge fraud against a father, because of an arrangement, whose only object was to protect the son against the consequences of his own extravagance. 2d. That as there was no real agreement to stop the salaries between Turner, Sr., and the appellant, Turner, Jr. can not insist now that there was such an agreement, merely because he was made to believe that such agreement was made; unless, perhaps, he was fraudulently mislead to his prejudice. 3d. Turner, Jr., could not be and was not prejudiced. His claim to salary is just as good as that of the appellant. And finally, it appears from the accounts in the case, that there was no profits in the business in 1881 and 1882. If no profits, then the salary claimed by the appellant would be paid exclusively by Turner, Sr., and Turner, Jr., would not contribute anything thereto nor lose anything by its being paid. The only possible result would be to give him a claim for salary which he thought he did not have. Therefore, instead of being injured by this alleged fraud, he is benefited.

The appellant is therefore entitled to $450 per month, salary from March 19, 1878, to January 1, 1883, with interest. Statement 2 of Account E, which was ratified by the Court, is consequently erroneous in the matter of salary, as it allows appellant only $300 per month, from March 19, 1878, to August 1, 1881, without interest.

2. As to the New Orleans shipment, the Court below says: "The manufactured goods on hand at the time of the dissolution of the partnership were taken by Mr. Turner at the cost prices of the raw material which composed

them.    I do not think this was right.    These goods, in their manufactured state, were worth more than when in the form of raw materials.    The labor of manufacture, the reputation of the brand and the prepared form in which they were ready to be put on the market—all these elements. went into their value, increasing it above that of the raw materials."    The Court thought that the plaintiff was entitled to his portion of the net profits realized on the sale.

The matter was again referred to the Auditor, and evidence was taken by the appellees, tending to show that the goods were sent down to New Orleans, to be there sold, and in the event an extensive loss of $12,163.35 was sustained, and now the appellees make the astonishing proposition that the appellant must stand one-third of this loss.    Upon what possible theory could the appellant be chargeable with the loss on this cargo?    In one aspect of the case, Turner, Sr., in taking these goods, even in liquidation, without consulting his co-partner, the appellant, upon prices fixed by himself, could be regarded as a wrongful taker and holder of the goods, as a trustee *ex maleficio.*    In that character he would undoubtedly be liable to the true owner of the goods for any profits which he might make; and that was the whole extent of the contention below; but certainly he could not recover from the person he had wronged any loss which he himself sustained in any subsequent handling of the goods.    He is at all events liable to the true owner for the real value of the goods, and his liability may be increased if he makes any profit out of the wrongful transaction.

The appellee's construction of the Court's ruling is a genuine *reductio ad absurdum.*    Thus: Turner, Sr., took 510 tons of phosphate at $22 per ton, total $11,220.    The Court says that this is only the cost of the raw material, and we are entitled to more than that.    Turner, Sr., then ships these 510 tons to New Orleans, and after spending a great deal of time in selling them, sustains a loss of $10,000. Now, the appellees argue that the goods taken by Turner, Sr., and which the Court said were worth more than $11,220, are really worth $10,000 less than nothing.

It cannot be contended that the partnership continued as to these goods. The proof shows that they were shipped in the name of J. J. Turner, Sr.; that they were entered on the books of the subsequent firm as assets of that firm, and dealt with altogether as their own property. The appellant had no interest in them at all from the time they were taken by Turner, Sr., except to get from him their fair value.

There was no election here, as indicated by the Court below. The appellant simply insisted that the values put on the goods were too low. There was no contention that the goods did not belong to Turner, Sr., after he had taken them over, but he was asked merely to pay the *fair value* for them.

We submit that Auditor's Account D should be ratified, as it is based upon the average cost of these goods to the manufacturer, after a comparison of several years of business. The conclusions reached as to values in Auditor's Account D are strikingly corroborated in the evidence furnished by the appellees themselves. When they sent this cargo to New Orleans, it was supposed to contain 620 1-12 tons of Am. Phosphate, and 7,444 empty bags. In marine insurance the invoice cost of the goods is usually increased 10 per cent. for manufacturer's profit.

The insurance on this cargo was.............$24,000 00
7,444 bags cost ....................$766 20
10 per cent.... .................. 76 62
                                    ———— 842 82
                                           —————
Insured value of 620 1-12 tons......$23,157 28

But, as this amount included 10 per cent. added to the invoice cost, the real cost of the 620 1-12 tons, as estimated by the appellees themselves, is $21,051.99, or about the value which we reach by an entirely different method of calculation.

*William A. Fisher* and *John Prentiss Poe, Attorney-General*, for the appellees.

*As to the New Orleans shipment.* Mr. Turner having taken these goods over at what he honestly believed was their fair value, and having, as the result showed, lost heavily by thus taking them over, stood to what he had done, and made no attempt to ask from Mr. Keiley a reimbursement to him of his one-third of such losses, but was content to bear them alone. ·When, however, his right thus to deal with this merchandise is successfully challenged by Mr. Keiley, the natural and obvious equity of the case would seem to require that he should bear his fair share of the losses actually sustained by the liquidating partner, and in the absence of any allegation and proof of careless, improvident or fraudulent conduct of the liquidating partner in making disposition of the merchandise belonging to the firm, either in the shipment to New Orleans or in the sales here, the appellant seeking equity should do equity.

He claims that he is entitled to the market value of the manufactured goods taken over and disposed of by the liquidating partner. Grant it. How is this market value to be ascertained? By the known results of the actual sales of every pound of the goods, as we contend, or by an average estimate of what similar goods during an average of former years had produced, as he contends? By an allowance, also, of the several items of cost, viz.: storage, clerk hire, commissions, bad debts, &c., or by a rejection of these manifestly fair items? Obviously the former of these two modes has the merit, not a small one in a case of this description, of absolute exactness, while the latter necessarily involves uncertainty and conjecture.

The one insisted on by us is the exact result which would have been reached if the partners had jointly made the sales after the dissolution, received every dollar of the gross proceeds of the sales, paid out of such proceeds all the cost of selling them, including storage, clerk hire, commissions and the like, and borne equally amongst themselves the losses

occasioned by bad debts—that is, the failure of some of the
parties purchasing some of the goods to pay for them.
The other mode, that urged by the appellant, is not only an
estimate merely of the market prices that the goods might
have been sold for, but it puts upon the liquidating partner
all the burden, liability and responsibility of finding a sale
for the goods, as well as the cost and expenses of keeping.
the goods until sold, and the failure to collect from the pur-
chasers the prices agreed to be paid.

*As to salaries.*    From the statement in plaintiff's bill, it
seems clear that the articles of co-partnership were executed
in blank, and he alleges that three copies were executed—
the copy which he retained having inserted in it, *after exe-
cution*, and without the knowledge or consent of J. J. Tur-
ner, Jr., the provision in his, Keiley's favor of $450 a month.
It is not often, we hope, that a litigant comes into Court
founding his claims upon a secret addition to a written
instrument, not only not known to, but carefully concealed
from a party who is sought to be bound by it ; and it is not
surprising that the Court below did not adopt this somewhat
extraordinary contention of Mr. Keiley.

The alleged original secret agreement is not proved.    Mr.
Keiley's averment in his bill, can not be accepted as proof.
His allegation is denied distinctly by J. J. Turner, Jr., and
is not admitted in the answer of J. J. Turner, Sr.    But even
if the answer of the latter can be treated as an admission of
the alleged agreement, such admission is not evidence
against J. J. Turner, Jr.    But if we assume for the sake of
the argument, that the precise details of this alleged private
agreement are proved, we further maintain, that it can not
be considered in this case.    The stipulation was confessedly
a private understanding between Mr. Keiley and J. J. Turner,
Sr., and hence is properly enforceable only in a proceeding
between the *two* parties to it.·    Surely it has no fair place in
a joint accounting between the *three* partners.

For similar reasons, the discontinuance in August, 1881,
of all the salaries to all the partners is binding upon all in
this joint accounting of the affairs of the partnership.

It was competent for the partners, by common consent, to modify any of the terms of their co-partnership understanding ; and accordingly, when the three partners determined that from and after August 1, 1881, no salaries should be paid to any of the partners, this constituted from that time out a new contract, binding upon, and enforceable against, all *three ;* and no Court of Equity, we submit, can be expected, in the face of an admitted agreement between *three* partners, to give effect, as against one of the three, in a joint accounting of the affairs of the whole firm, to a *secret* agreement between *two.* The carrying into effect of such a private agreement would operate practically as a fraud upon the third partner, from whom the existence of such a secret stipulation between the two was carefully withheld.

BRYAN, J., delivered the opinion of the Court.

This suit was instituted by the appellant for the purpose of obtaining a settlement of the partnership business of J. J. Turner & Co. The firm was composed of Joshua J. Turner, his son-in-law John D. Keiley Junior and his son Joseph J. Turner. The record is a very large one, and is filled with elaborate examinations and cross-examinations of witnesses, and with long and minute statements relating to the matters in controversy, made up from the books and papers of the partnership and from other sources. We were informed at the argument by the counsel on both sides that the subjects of dispute were few in number. But to make a just and intelligent disposition of these questions required a careful and attentive examination of the whole record, so as to understand the respective rights and duties of the partners, and the nature, extent and character of their dealings with each other.

We will state so much of the proceedings in the cause as may be necessary to explain the grounds of the opinion which we have formed in regard to this controversy. The bill of complaint alleges that on the nineteenth day of March eighteen hundred and seventy-eight, a co-partnership was formed between the complainant John D. Keiley

and Joshua J. Turner and Joseph J. Turner Junior, under the name and style of J. J. Turner & Co., and that the business of the co-partnership was to deal in fertilizers and agricultural goods of every description. A paper called a *copy* of the articles of co-partnership was filed with the bill, marked " Complainant's Exhibit No. 1," and it was alleged that three copies of the articles of agreement were executed and signed by all the partners, which were identical in every respect, except in the provisions relating to the salaries of the partners. These provisions will be noticed hereafter. The paper filed with the bill states that during the continuance of the partnership Keiley's salary should be four hundred and fifty dollars a month, and that the salary of Turner Junior, should be three hundred dollars a month during the same period; no salary was allotted to Turner, Senior. In his answer Turner Junior says: " That whilst there were three copies of said articles, as stated in said bill, prepared, yet, as he remembers, only one of them was signed by the parties, of which complainant possessed himself, and is the Exhibit No. 1, so filed with said bill." And Turner, Senior, says in his answer: " That the partnership stated in said bill was entered into, and that the articles filed as Exhibit No. 1 constitute the agreement therefor then made, and that, although three copies thereof may have been written, yet, as he remembers, only one of them was signed, and that is the one filed with said bill." We think it very evident that the draughtsman of the bill inadvertently designated his exhibit as a *copy* when he intended to charge that it was an *original* paper, as it really is. The provisions relating to the salaries above mentioned as being different in the different copies of the articles of partnership are thus alleged in the bill of complaint. After stating that the matter was discussed in the Turner family, it is said: "It was suggested that the difference between the sum to be allowed said Joseph J. Turner Jr., as above proposed, would cause jealousy and ill-feeling on the part of the latter, and it was urged that the matter should be so

arranged that the difference should not be known to said Joseph J. Turner Jr., and accordingly it was arranged that Mr. Joshua J. Turner should be allowed $150.00 per month on the books, and your orator and Joseph J. Turner Jr., $300.00 each per month; the allowance to said Joshua J. Turner, however, to be for the use and benefit of your orator. In the preparation of the articles, which were signed after the partnership had begun, the amounts to be paid as salary to each partner were left blank on the three drafts, but at the time the articles were read and approved and executed, the amounts to be allowed to each partner were stated as being $300.00 each per month to your orator and Joseph J. Turner, Jr., and $150.00 to said Joshua J. Turner, as above agreed upon, but the two drafts of said agreement, that were retained by your orator and said Joshua J. Turner, had inserted in them the amount of $450.00 per month to your orator, and $300.00 to Joseph J. Turner, Jr., the actual amounts to be paid under the agreement aforesaid, between your orator and said Joshua J. Turner. Thus it came about that said Joshua J. Turner was credited on the books of the firm with $150.00 per month, which he was to pay to your orator as part of his salary. And settlements were had between him and said Joshua J. Turner on the basis of said agreement, your orator having received some payments on account of said allowance of $150.00 per month, from said Joshua J. Turner in other ways, and some in money drawn from the firm and charged to said Joshua J. Turner, as agreed, but a large sum yet remaining due him on this account. Your orator does not claim that in stating the partnership account prayed for, salaries shall be allowed on any other or different basis than the agreement among the members of the firm, that is to say, $300.00 each per month to him and said Joseph J. Turner, Jr., and $150.00 per month to said Joshua J. Turner, but he claims that as between himself and said Joshua J. Turner, the amount credited to the latter for salary shall be treated as credited to and due to your orator under the agreement

aforesaid." Responding to this statement, Turner Junior, in his answer says, that all previous negotiations in regard to salaries were merged in the articles of co-partnership, and that "as to the arrangement therein provided as to the payment of salaries, his only knowledge is as therein contained, and he is prepared to abide thereby; but as to any sub-arrangements between said Keiley and his father as to any division of his salary he knows nothing, is not a party thereto, nor in any manner connected therewith." And Turner, Senior, in his answer says: "That, however, the matter of salary was arranged at the time, and this defendant, in his then state of health, not attaching any great importance thereto, by reason of the relationship of the parties, he did agree to the alterations of the articles as stated, and entries were made for the purpose of family peace, as stated." The articles provided that the partnership should continue for three years; it is alleged, however, in the bill, that it was continued until the thirty-first of December, eighteen hundred and eighty-two, when it was finally dissolved. The complainant alleges that upon a settlement of the partnership affairs it will be found that a large sum of money is due to him. The prayer of the bill is for an account and for the payment of the balance due. After answers by the Turners, and the taking of testimony, an account was decreed and several different accounts were stated by the Auditor. In the meantime Joshua J. Turner had died, and the Safe Deposit and Trust Company had been appointed his executor. After hearing, the Court below ratified statement No. 2 of Account E, which showed a balance due by Keiley, and it decreed the payment of this balance to the executor of Joshua J. Turner. Keiley has appealed to this Court.

The amount of salary due to Keiley gives rise to one of the principal questions in the case. It will be observed that Complainant's Exhibit No. 1 fixes his salary at four hundred and fifty dollars a month. Both of the answers admit that this agreement was signed by all the partners, and they

do not admit or allege that any other one was signed, and there is no evidence that any other was signed.   This agreement, therefore, according to the ordinary course of practice, is established as the contract between the parties.   The answer of Turner Junior states that his only knowledge on the subject of salaries is what is contained in this exhibit, and that he is prepared to abide by it, and he disclaims any knowledge of what is styled sub-arrangements between Keiley and Turner, Senior, as to any division of his salary. The answer of Turner, Senior, distinctly states that "he did agree to the alterations of the articles as stated, and entries were made for the purpose of family peace as stated."   We see, therefore, that there is a perfect agreement as to Keiley's salary at four hundred and fifty dollars a month; and as to the very peculiar method of stating a portion of it on the books to the credit of the elder Turner for Keiley's benefit, all knowledge of an agreement to that effect is denied by the younger Turner, while it is admitted by the elder.   A majority of the Court are of opinion that Keiley is entitled only to a salary of three hundred dollars a month as against the assets of the firm, and that if he is entitled to the additional amount, $150.00, his recourse is entirely against the estate of Turner, Sr.   After the first day of August, 1881, there were no entries of salaries on the books of the firm.   This omission was with the knowledge and consent of all the parties.   There was evidence which the appellant's counsel argued sufficiently and satisfactorily explained this omission.   But the majority of the Court think otherwise, and hold that Keiley is not entitled to any salary after this date.   The writer of this opinion is constrained to hold a different view on both of these questions, but as the Court's judgment has been pronounced, any discussion of them would tend to no result and would be superfluous.

By the articles of partnership it appears that the elder Turner contributed all of its capital, and that it consisted of stock in trade, merchandise, land and buildings suitable for carrying on the business.   This capital was valued at one

hundred and twelve thousand, two hundred and forty-nine
dollars and seventy-eight cents, and it was agreed that he
should be paid interest on this sum half yearly at the rate
of six per cent. per annum, and that this payment of interest
should be considered an expense of the business, and so
charged on the books. There seems to be no dispute
about the amount due him except in one particular. In
the settlement of the accounts he took into his possession
the stock and merchandise of the firm which remained on
hand, and he charged himself with it at a valuation fixed
by himself and the younger Turner. Keiley knew that he
had taken possession of this merchandise and did not object
to it. But the question is about the value of it. As Keiley
assented to the appropriation of it, he is entitled to its
value at the time; he would not be entitled to any increase
in value; neither is he to lose by any depreciation. We
see nothing in the record which can justly give any ground
for a question of fraud in the transaction. It is simply a
question of amounts and value. The parties differ very
materially on these questions, but this is a very usual occur-
rence in lawsuits. The principal item is a quantity of ammo-
niated phosphate. Turner, Senior, is charged with five hun-
dred and ten tons as belonging to the firm, while Keiley
contends that he ought to be charged with six hundred and
twenty-six and a fraction. The question is not entirely clear
upon the evidence, but, after a careful consideration of it,
our best judgment is that the firm owned five hundred and
ten tons, and that the remainder of the ammoniated phos-
phate which Turner had in his possession was his individ-
ual property. The valuation presents a question of con-
siderable difficulty. A good deal of testimony was taken
on the subject, and calculations were made by the plaintiff's
counsel to show the average value of the phosphate dur-
ing the preceding year. This would give an approximation
more or less accurate. We have, however, an estimate of
more satisfactory. It is a valuation made by Turner him-
self. He shipped all of this merchandise to New Orleans in

his own name and insured it in his own name. The amount of phosphate was estimated at six hundred and twenty and a-half tons, and it was insured for twenty-four thousand dollars. It is shown by the testimony of Willson, the marine insurance agent who effected the insurance, that it is usual to add ten per cent. to the invoice cost in insuring cargoes. So that we may assume that the amount insured was the value of the phosphate with ten per cent. added. A very simple calculation will show the value to be placed on the whole mass of six hundred and twenty and a-half tons; and the proportion of value to be assigned to five hundred and ten tons is equally easy of ascertainment. This amount will be charged to Turner as the fair price of the phosphate at the time he took it into his possession as his individual property. A loss was sustained on the shipment to New Orleans, which was caused in great measure by the failure of the purchasers of the phosphate to pay for it. With this loss Keiley has no concern.

The interest on Turner's capital was credited to him down to December thirtieth eighteen hundred and eighty-two. It appears that he did not draw his interest semi-annually as it accrued, but let it remain as part of the capital of the firm ; and that he was allowed interest on these successive contributions of capital, which was computed from the several times at which the interest became due. It was stipulated in the articles of partnership that the salaries and the interest on Turner's capital should be paid out of the funds of the partnership. It was further stipulated that the profits should be equally divided between the partners, and that the losses should be borne in the same proportion; and that the salaries should not be considered as losses sustained by the business. The meaning of this latter provision is very evident. The salaries were to be paid at all events, and were not to be diminished on account of any losses which might occur. It was urged by the appellant's counsel at the argument that this rule was violated in the preparation of the balance sheet filed and marked " Defendant's

Exhibit Examiner F. A. L. No. 2." As the books from which this balance sheet was made up have not been shown to us, we have not the means of deciding on the merits of this suggestion. The record shows us that Keiley allowed large portions of his salary to remain in the hands of the firm. These sums were used for its benefit, and were contributions on his part to its capital. He ought to be paid interest on these amounts, not on the ground that payment was withheld by the firm, but for the reason that he furnished money which was used in the transaction of iits business. Payments of salary were due monthly, and from the time they became due interest is properly chargeable for his benefit; that is to say, each month's salary is to bear interest severally as it became due, in the same manner as interest was allowed to Turner on the half-yearly instalments which were payable to him.

We have stated our views on the questions which the counsel informed us at the argument were the matters of difference between them. The result is that Statement No. 2 of Auditor's Account E is rejected and set aside, and the decree of the Court below is reversed and the cause remanded, to the end that an account may be stated in accordance with this opinion, and a decree passed for the payment of the sum thus ascertained to be due.

*Decree affirmed in part and reversed in part; the costs in this Court to be equally divided, and the costs below to be paid by the appellees.*

(Decided March 27th, 1895.)